THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ESOUSA GROUP HOLDINGS LLC,

        Plaintiff,

  -against-

NUBURU, INC.,

        Defendant.

24 Civ. 07799 (AKH)

---

### [PROPOSED] ORDER GRANTING PERMANENT INJUNCTION

ALVIN K. HELLERSTEIN, District Judge:

On October 28, 2024, the Court held a hearing on the motion of Plaintiff Esousa Group Holdings LLC ("Esousa") for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 (the "Preliminary Injunction Motion").

The Court has reviewed Esousa's Complaint (ECF No. 1); Esousa's Order to Show Cause (ECF No. 4); Esousa's Memorandum of Law in Support of the Preliminary Injunction Motion (ECF No. 5); the Declarations of Andrew B. Kratenstein and Michael Wachs ("Wachs Decl."), each dated October 14, 2024, and the exhibits attached thereto (ECF Nos. 7-8); the Memorandum of Law of Defendant Nuburu, Inc. ("Nuburu") in Opposition to the Preliminary Injunction Motion (ECF No. 18); the Declaration of Brian Knaley, dated October 18, 2024, and the exhibit attached thereto (ECF No.19); Esousa's Reply Memorandum of Law in Support of the Preliminary Injunction Motion (ECF No. 21); the Supplemental Declaration of Michael Wachs, dated October 21, 2024, and the exhibits

attached thereto (ECF No. 22); and the argument presented by the parties during the hearing held on October 28, 2024 (the "Hearing").

For the reasons stated on the record of the Hearing and below, the Court finds as follows:

1. On August 6, 2024, Esousa and Nuburu entered into a Securities Purchase Agreement (the "August 6 SPA") and an Exchange Agreement (the "August 6 Exchange Agreement"). (Wachs Decl. Exs. A-B.)

2. Pursuant to those contracts, Esousa agreed to purchase from Nuburu a newly issued Convertible Note with a face amount of $525,000 in exchange for $500,000 in cash. (Wachs Decl. Ex. C § 1.)

3. Pursuant to the August 6 Exchange Agreement, Esousa also agreed with Nuburu to exchange a promissory note with an outstanding principal amount of $500,000 in Nuburu debt, which Esousa had acquired from a third-party creditor, for a newly issued Convertible Note. (Wachs Decl. Ex. B Second Whereas Clause and § 1.)

4. On August 19, 2024, Esousa and Nuburu entered into a second SPA (the "August 19 SPA") and a second Exchange Agreement (the "August 19 Exchange Agreement"). (Wachs Decl. Exs. E-F.)

5. Pursuant to the August 19 SPA, Esousa agreed to purchase a Convertible Note with a face amount of $148,000 in exchange for $148,000 in cash. (Wachs Decl. Ex. G § 1.)

6. Pursuant to the August 19 Exchange Agreement, Esousa agreed with Nuburu to exchange a promissory note with outstanding principal amount of $136,968 in

Nuburu debt, which Esousa had acquired from a third-party creditor, for a newly issued Convertible Note. (Wachs Decl. Ex. F Second Whereas Clause and § 1.)

7. The August 6 and 19 SPAs are referred to herein collectively as the "SPAs." The August 6 and 19 Exchange Agreements are referred to herein collectively herein as the "Exchange Agreements." The SPAs and the Exchange Agreements are referred to herein collectively herein as the "Agreements."

8. In the SPAs, Nuburu agreed (among other things) in Section 4(j) to certain restrictions on any issuance, offer, sale, grant of any option or right to purchase or other disposition of any Nuburu equity security or any Nuburu equity-linked or related security for a specified time period called the "Restricted Period."

9. Section 4(j) of the SPAs reads in full as follows:

Additional Issuance of Securities. The Company agrees that during the Restricted Period, the Company shall not directly or indirectly issue, offer, sell, grant any option or right to purchase, or otherwise dispose of (or announce any issuance, offer, sale, grant of any option or right to purchase or other disposition of) any equity security or any equity-linked or related security (including, without limitation, any "equity security" (as that term is defined under Rule 405 promulgated under the 1933 Act), any Convertible Securities, debt (with or related to equity), any preferred stock or any purchase rights) ("Additional Issuance"). Notwithstanding the foregoing, this Section 4(j) shall not apply in respect of the following: (i) issuances pursuant to acquisitions, joint ventures, license arrangements, services, leasing arrangements and similar transaction arrangements; (ii) an issuance of shares of Common Stock issued pursuant to agreements existing as of the date of this Agreement or upon the conversion or exercise of Convertible Securities issued prior to the date hereof, provided that the conversion or exercise (as the case may be) of any such Convertible Security is made solely pursuant to the conversion or exercise (as the case may be) provisions of such Convertible Security that were in effect on the date immediately prior to the date of this Agreement, the conversion or exercise price of any such Convertible Securities is not lowered, none of such Convertible Securities are (nor is any provision of any such Convertible Securities) amended or waived in any manner (whether by the

Company or the holder thereof) to increase the number of shares issuable thereunder and none of the terms or conditions of any such Convertible Securities are otherwise materially changed or waived (whether by the Company or the holder thereof) in any manner that adversely affects any Buyer; (iii) the issuance of compensatory equity awards to employees, directors and other third parties under an Approved Share Plan; provided that provisions of such Approved Share Plan that were in effect on the date immediately prior to the date of this Agreement remain in effect without amendment in any manner that adversely affects any Buyer, including any amendment to increase the number of shares issuable thereunder; (iv) the issuance of shares of Common Stock (or pre-funded warrants) for an aggregate purchase price not to exceed $800,000, provided that the following conditions are met: (A) the Company has first offered the sale of such Common Stock (or pre-funded warrants) to each Buyer and no Buyer has accepted such offer within ten (10) days of such initial offer and the sale is conducted under substantially similar terms as what was offered to the Buyers, (B) the Common Stock is issued pursuant to an exemption from registration under the 1933 Act, and (C) the Company shall not register resales of such shares of Common Stock until it has obtained Stockholder Approval and all Registrable Securities are registered pursuant to the terms the Registration Rights Agreement; and (v) the issuance of the Convertible Notes and the Conversion Shares. Stockholder Approval. The Company shall either (x) if the Company shall have obtained the prior written consent of the requisite stockholders (the "Stockholder Consent") to obtain the Stockholder Approval (as defined below), inform the stockholders of the Company of the receipt of the Stockholder Consent by preparing and filing with the SEC, as promptly as practicable after the date hereof, but prior to the tenth (10th) calendar day after the Closing Date, an information statement with respect thereto or (y) provide each stockholder entitled to vote at a special meeting of stockholders of the Company (the "Stockholder Meeting"), which shall be promptly called and held as soon as feasible, but not later than the sixtieth (60th) calendar day after the Closing Date (the "Stockholder Meeting Deadline"), a proxy statement. The proxy statement, if any, shall solicit each of the Company's stockholder's affirmative vote at the Stockholder Meeting for approval of resolutions ("Stockholder Resolutions") providing for the approval of the issuance of all of the Conversion Shares in compliance with the rules and regulations of the Principal Market (without regard to any limitations on conversion set forth in the Note) (such affirmative approval being referred to herein as the "Stockholder Approval", and the date such Stockholder Approval is obtained, the "Stockholder Approval Date"), and the Company shall use its reasonable best efforts to solicit its stockholders' approval of such resolutions and to cause the Board of Directors of the Company to recommend to the stockholders that they approve such resolutions. The

Company shall be obligated to obtain the Stockholder Approval by the Stockholder Meeting Deadline.

(Wachs Decl. Exs. A, E § 4(j).).

10. The Exchange Agreements contain nearly identical provisions. (Wachs Decl. Exs. B, F § 3.)

11. The only difference between the two provisions is the definition and duration of the "Restricted Period."

12. The SPAs define "Restricted Period" as the period beginning on the date of execution and ending on the date that is the thirtieth (30th) day after the latest of certain enumerated events, one of such events being the date on which Stockholder Approval (as defined in the SPA) is obtained for the conversion of the Convertible Notes into common Nuburu shares. (Wachs Decl. Exs. A, E § 9(q).)

13. Under the Exchange Agreements, the Restricted Period began on the date of execution (August 6 and 19, 2024, respectively) and ends on the date that is the 90th day after execution – i.e., November 4 and 17, 2024, respectively. (Wachs Decl. Exs. B, F § 1(b)(xi).)

14. Nuburu stipulates that none of the Restricted Periods under the Agreements has lapsed.

15. The Agreements require all notices to be in writing. (Wachs Decl. Exs. A, E § 10(f), Exs. B, F § 7(r).)

16. Finally, the SPAs contain a clause concerning remedies, which states:

Remedies. Each Buyer [i.e., Esousa] and each holder of any Securities shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders

have under any law. Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security, to the extent permitted by law), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company [i.e., Nuburu] recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under the Transaction Documents, any remedy at law may prove to be inadequate relief to each Buyer. The Company therefore agrees that each Buyer shall be entitled to seek specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving actual damages and without posting a bond or other security.

(Wachs Decl. Exs. A, E § 10(m).)

17. The Exchange Agreements contain a similar provision, which states:

<u>Remedies.</u> Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company [i.e., Nuburu] recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under any of the Exchange Documents, any remedy at law may prove to be inadequate relief to the Creditor. The Company therefore agrees that the Creditor shall be entitled to seek specific performance and/or temporary, preliminary and permanent injunctive or other equitable relief from any court of competent jurisdiction in any such case without the necessity of proving damages and without posting a bond or other security.

(Wachs Decl. Exs. B, F § 7(g).)

18. On October 7, 2024, Nuburu filed a Form 8-K with the United States Securities and Exchange Commission, which announced certain transactions (the "Liqueous Transactions") between Nuburu and Liqueous L.P. ("Liqueous"). (Wachs Decl. Ex. I.)

19. The announcement stated:

**Item 1.01 Entry into a Material Definitive Agreement.**

*Master Transaction Terms*

On October 1, 2024, Nuburu, Inc. (the "Company") entered into a master transaction terms agreement (the "Master Agreement") with Liqueous LP, a Delaware limited partnership (the "Investor") pursuant to which, the Company and the Investor established a strategic financing framework for short-term and long-term financing for the Company. The Master Agreement provides for: (i) an immediate capital infusion from the Investor of $3 million at current market price, (ii) subsequent weekly capital infusions of $1,250,000 at market price until an additional $10 million has been invested; (iii) the acquisition and conversion of certain outstanding notes, with each $1.00 of debt converted into $2.00 of common stock at market price; (iv) an adjustment to current market price of certain outstanding pre-funded warrants held by the Investor having a current cash value of approximately $2.2 million; and (v) the implementation of a $50 million equity line of credit (the "ELOC") pursuant to which the Company may require the Investor to purchase common stock from time-to-time in the amounts and for the prices determined in accordance with the terms of the ELOC. Before the ELOC may be fully utilized, shares subject to the ELOC must be registered for resale and the Company must obtain consent from stockholders to issue shares in excess of 19.99% of the Company's common stock as of the date of the ELOC.

*Initial Investments*

As provided in the Master Agreement, on October 1, 2024, the Company entered into two Securities Purchase Agreements with the Investor pursuant to which the Investor will acquire pre-funded warrants on substantially the same terms as prior pre-funded warrants executed between the parties: (i) the first providing for the acquisition by the Investor of pre-funded warrants exercisable for an aggregate of 6,849,315 shares of common stock, with an effective purchase price of $0.438 per share, for aggregate gross proceeds of approximately $3 million within five business days of execution; and (ii) the second providing for weekly capital infusions of $1,250,000 at market price until a total of $10 million has been invested, beginning 10 days after execution of the purchase agreement or upon filing of the registration statement registering the shares identified in (i) above for resale.

*Equity Line of Credit*

As provided in the Master Agreement, on October 1, 2024, the Company entered into a Common Stock Purchase Agreement with the Investor, pursuant to which the ELOC will be implemented. In addition to the Company being able to transfer common stock to the Investor from time-to-time in the amounts and for the prices provided in the ELOC, a $2,500,000 advance on the ELOC is available to the Company upon the filing of the registration statement relating to the resale of shares issued pursuant to the ELOC. Such advance is in the form of a convertible note, having an 8% annual interest rate and a default conversion rate at a 10% discount to the lower of the previous day's closing price or the prior five-day average. . . .

(Wachs Decl. Ex. I at 3.)

20. Nuburu neither notified Esousa of the Liqueous Transactions before announcing the execution of the Liqueous Transactions nor offered the terms of the Liqueous Transactions to Esousa.

21. Thus, the Liqueous Transactions were in breach of the Agreements as they violate the Agreements' restrictions that preclude Nuburu from issuing, offering, selling, granting any option or right to purchase, or otherwise disposing of (or announcing any issuance, offer, sale, grant of any option or right to purchase or other disposition of) any equity security or any equity-linked or related security and none of the contractual exceptions to this prohibition applies.

22. I also find that Esousa has no adequate remedy at law and that the balance of equities and public interest weigh in favor of granting Esousa injunctive relief.

Accordingly, IT IS HEREBY ORDERED that:

1. Esousa's Preliminary Injunction Motion be, and hereby is, granted to the extent set forth below and Nuburu has consented to the issuance of permanent injunctive relief as set forth below;

2. Nuburu be, and hereby is, permanently enjoined from proceeding with or otherwise executing or consummating the Liqueous Transactions until the Restricted Period as defined in the Agreements expires and may not offer, sell, or otherwise transfer any share of capital stock of Nuburu or any securities convertible into or exercisable or exchangeable for shares of capital stock of Nuburu to Liqueous, unless such offer, sale, or transfer does not violate the terms of the Agreements, including Section 4(j) of the SPAs and Section 3 of the Exchange Agreements, until the Restricted Period as defined in the Agreements expires; and

3. The sole issue remaining in this case is whether and to what extent Esousa is entitled to indemnification from Nuburu as sought in Count II of Esousa's Complaint.

SO ORDERED.

_____
HON. ALVIN K. HELLERSTEIN
UNITED STATES DISTRICT COURT JUDGE

Dated: Oct. 31, 2024
New York, New York